1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                        FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9    L.F., a minor, by and through DANISHA           Consolidated case 2:17-cv-01648-KJM-DB
     BROWN, and K.F., a minor, by and
10   through DANISHA BROWN,

11                  Plaintiffs,                       ORDER

12          v.

13   CITY OF STOCKTON, STOCKTON
     POLICE DEPARTMENT, ERIC T.
14   JONES, DAVID WELLS,

15                  Defendants.

16

17   M.C.F., by and through his Guardian ad
     Litem ELIZABETH CASAS BAUTISTA,
18   individually and as successor-in-interest to
     Decedent COLBY FRIDAY; K.S.F., by
19   and through her Guardian ad Litem,
     ELIZABETH CASAS BAUTISTA,
20   individually and as successor-in-interest to
     Decedent COLBY FRIDAY; THE
21   ESTATE OF COLBY FRIDAY, by and
     through its personal representative
22   DENISE FRIDAY HALL,

23                  Plaintiffs,

24          v.

25   CITY OF STOCKTON, STOCKTON
     POLICE DEPARTMENT, ERIC T.
26   JONES, DAVID WELLS,

27                  Defendants.

28

                                              1

1  I.      INTRODUCTION

2          On August 16, 2016, Stockton Police Officer David Wells observed Colby Friday

3  walking down a street in Stockton, California.  Mistaking Friday for another individual with

4  similar physical characteristics who was subject to an outstanding warrant for domestic violence,

5  Wells attempted to initiate contact.  While Wells parked his patrol vehicle, Friday continued into

6  a corner supermarket.  Wells followed and attempted to speak with Friday, but Friday ignored

7  him and hastily exited the market.  A chase ensued, and Wells, saying he feared for his safety,

8  fired thirteen shots from his service revolver, killing Friday.

9          Friday's minor children L.F. and K.F., by and through their guardian ad litem

10  Danisha Brown, bring this civil rights action under 42 U.S.C. § 1983 for violation of their rights

11  to familial association under the First and Fourteenth Amendments, and also assert various state

12  law claims.  Friday's estate, by and through its personal representative, Denise Friday Hall, and

13  two other minor children M.C.F. and K.S.F., by and through their guardian ad litem Elizabeth

14  Casas Bautista, sue under 42 U.S.C. § 1983 for excessive force and denial of medical care in

15  violation of the Fourth Amendment, violation of the right to familial association under the

16  Fourteenth Amendment, municipal liability based on an unconstitutional custom or policy, and

17  also bring various state law claims.  On March 23, 2018, the court consolidated the two sets of

18  claims into a single action under the operative case number 2:17-cv-1648-KJM-DB.  Defendants

19  now move for summary judgment, or, in the alternative, for partial summary judgment on all

20  claims.  For the reasons provided below, defendants' motion for summary judgment is

21  GRANTED in part and DENIED in part.

22  II.     BACKGROUND

23          A.      Disputed and Undisputed Facts

24          The following disputed ("DF") and undisputed ("UF") facts are derived from the

25  responses and objections of plaintiffs M.C.F., K.S.F. and the Estate of Colby Friday to

26  defendants' statement of undisputed facts, ECF No. 71-2 ("Estate's DF or UF"),[1] and defendants'

27  _____

28          [1] Although plaintiffs L.F. and K.F. also filed separate responses and objections to
defendants' statement of undisputed material facts, ECF No. 69-2, the court relies exclusively on

1    consolidated response and objections to both sets of plaintiffs' separate statements of disputed

2    material facts in opposition to defendants' motion for summary judgment.  ECF No. 74-2 ("Defs.'

3    DF or UF").  The court notes whether a fact is disputed or undisputed but resolves evidentiary

4    objections only to the extent needed for its analysis below.

5                        1.      The August 16, 2016 Incident

6                            a)      The Shooting

7                Officer David Wells is a police officer employed by the City of Stockton.  Estate's

8    UF 1.  On August 16, 2016, while on patrol sometime before 2:00 p.m., Wells observed an

9    African-American male, roughly 6 feet tall, approximately 200 pounds, with dreadlocks, walking

10   near Pena's Meat Market on Jamestown Street in Stockton, California.  Estate's UF 2, 8.  The

11   individual was Colby Friday.  Estate's UF 9.  Wells contends he mistook Friday for another

12   individual with similar characteristics, Kyle Hamilton.  Estate's DF 7, 10, 12.  Wells never saw,

13   nor requested to see, a photograph of Kyle Hamilton and recognized the possibility that he might

14   be mistaken in believing the individual to be Kyle Hamilton.  Defs.' UF 9, 11.  Wells had

15   information and believed that Hamilton had an outstanding felony arrest warrant, had been

16   involved in a domestic violence incident while armed with a firearm the week prior to August 16,

17   2016, and resided at an apartment complex located at 4500 Shelley Court in Stockton.  Estate's

18   UF 4–6.  When Wells spotted Friday, Friday was walking from a direction Wells believed was

19   consistent with where Hamilton resided.  UF 11.

20               Wells attempted to initiate contact with Friday to determine if he was in fact Kyle

21   Hamilton, and if so, Wells intended to arrest him.  Estate's UF 13.  Wells parked his patrol

22   vehicle in the parking lot near Pena's Market.  Estate's UF 15.  When Wells exited his vehicle to

23   initiate contact, he observed that Friday had entered the market; Wells followed.  Estate's UF 18,

24   19.  Wells did not use his department-issued radio to advise dispatch that he observed a possible

25   suspect or to request backup, nor did he activate his body-worn camera as required by Stockton

26   ───────────────────

27   Estates' responses because the two responses are identical, save for the responses unique to
     Estates' survival action for lack of medical care under 42 U.S.C. § 1983.  *Compare* ECF No. 69-2
     at 14 (noting material facts numbers 54 and 55 are inapplicable to L.F. and K.F.'s claims), *with*

28   ECF No. 71-2 at 14–15 (providing specific responses to material facts numbers 54 and 55).

1   Police Department ("SPD") policy.  Defs.' UF 12, 13.  On that day Wells was equipped with the

2   body-worn camera, as well as a taser, flashlight, firearm, department-issued radio, handcuffs,

3   extra magazine, badge and police-issued vest.  Estate's UF 17.

4              When Wells entered the market, he lost sight of Friday.  Estate's UF 20.  Wells

5   then asked the woman tending the front counter if she had seen the man that had entered the store;

6   she directed him to the back of the market.  Estate's UF 21.  When Wells located Friday near the

7   back of the market, he told him, "I need to talk to you."  Estate's UF 23.  Friday ignored Wells,

8   then began walking away in a northbound direction.  Estate's UF 24, 25.  Wells followed,

9   continuing his attempt to contact Friday.  Estate's UF 26.  While in the market, after locating him

10  Wells never lost sight of Friday; however, his view of Friday's entire body was partially

11  obstructed by aisles and products displayed on shelves.  Estate's UF 27.  As Friday began

12  walking toward the market's entrance, Wells said, "[Y]ou in the white shirt, stop right there."

13  Estate's UF 28.  Wells generally could not see Friday's hands while he was in the market; but, as

14  Friday approached the entrance, Wells observed Friday's left hand inside the waistband of his

15  pants.  Estate's UF 29, 30.  Defendants contend Wells believed the person he thought was

16  Hamilton was possibly armed, based on his knowledge that Hamilton was known to possess a

17  firearm.  Estate's DF 31.  As Friday exited the market, he flung the door open with his right hand

18  and ran outside in a northbound direction.  Estate's UF 32, 33.  Wells gave chase, but before

19  exiting the market in pursuit, he drew his firearm.  Estate's UF 33, 34.

20             Fleeing northbound, Friday then turned into the parking lot and ran to the back

21  side of the building.  Estate's UF 35.  Throughout the pursuit, Wells never saw Friday's left hand

22  leave his waistband.  Estate's UF 36.  As Wells followed, he told Friday to stop or "I'm going to

23  shoot you in your back."  Estate's UF 37; Defs.' UF 15.  Defendants contend Friday failed to

24  comply with Wells's commands and continued to flee instead.  Estate's DF 38.  Friday eventually

25  reached a locked gate at the back of the building, at which point his cellphone fell to the ground

26

27

28

                                                    4

1   and he reached down to retrieve it.  Defs.' UF 16, 17.[2]  As Friday reached toward the ground,

2   Wells discharged his firearm, firing a volley of three or four shots.  Estate's UF 40; Defs.' UF 19.

3   Plaintiffs contend Wells provided no warning he would shoot Friday after Friday had stopped

4   running; defendants claim Wells gave Friday multiple verbal warnings, including "stop running"

5   and "don't move," before discharging his firearm.  Estate's DF 41; Defs.' DF 20.  Defendants

6   contend that prior to Friday's reaching down to the ground, Wells heard the distinct sound of

7   metal hitting the pavement, and at the point Wells discharged his firearm, he believed Friday was

8   reaching down to retrieve a gun.  Estate's DF 42, 44.  Nonetheless, at the time Wells discharged

9   his firearm, Wells had not actually seen Friday in possession of a weapon.  Estate's UF 43.

10              After being struck by the first volley of shots, Friday fell to the ground, on his left

11   side, facing away from Wells.  Defs.' UF 21.  Plaintiffs contend that while Friday was on the

12   ground after being shot, Friday was not reaching toward anything.  Defs.' DF 22.  After a brief

13   lapse in time after the first volley, less than two seconds, Wells then fired a second volley of

14   shots, Defs.' UF 23, emptying his service weapon, which held a total of thirteen rounds, Defs.'

15   UF 24.  In all, Wells fired a total of thirteen rounds in less than eight seconds.  Estate's UF 46.

16   Friday was shot eight times, and one shot delivered a fatal blow to his head.  Estate's UF 47, 50.

17   None of the gunshot wounds were to his back.  Estate's UF 49.

18              b)      Post-Shooting Response and Investigation

19              After Wells emptied his service revolver, he activated his body-worn camera,

20   reloaded his weapon and used his radio to make a "shots fired" announcement.  Defs.' UF 25.  As

21   Wells approached Friday's body, he encountered Michael Chapman, a witness standing on the

22   other side of the locked gate who was attempting to record the scene with his cellphone.  Defs.'

23   UF 26, 27.  Wells commanded Chapman, "Hey! Put that camera down and come help me save his

24   life! Come here! Get some towels!"  Defs.' UF 28.  Wells then rolled Friday's body from lying on

25   his left side to lying on his back.  Defs.' UF 29.

26

27              [2] There exists surveillance video of the incident from adjacent 4707 Kentfield Apartments.
    *See* Defs.' Not. of Lodging Ex., ECF No. 67.  The parties have competing interpretations of the

28   video.  *See* Estate DF 41.

1        Next, Wells approached the locked gate and said to Chapman, "Is he—he's going

2  to be gone, boss.  Hey, somebody picked up that pistol that was right here.  Man!  Gosh dammit!

3  He had a gun, man!  He drew a gun on me and turned around and walked back towards the gun!"

4  Defs.' UF 30.  Wells continued, "It's right there.  Don't—don't touch it," then he radioed

5  dispatch, "The suspect's pistol is laying on the grass here."  Defs' UF 32, 33.  A loaded 45

6  Caliber semi-automatic pistol was located in a grassy area on the other side of the gate from

7  where Friday was shot.  Estate's UF 51.  Defendants say Friday's DNA was detected on two of

8  the bullets found in the pistol, Defs.' UF 38; however, plaintiffs contend the presence of Friday's

9  DNA was due at least in part to the incompetence of investigative personnel, who contaminated

10  the bullets by handling and unloading the gun at the scene of the shooting as opposed to in a

11  sterile lab environment, Estate's DF 52.  A black Kyocera cellphone was also located near the

12  scene.  Estate's UF 53.

13        After speaking with Chapman, Wells returned to Friday's body, checked his vitals

14  and began chest compressions until relieved by other personnel.  Defs.' UF 34, 36.  Emergency

15  medical response arrived at the scene within ten minutes of Friday's being shot.  Estate's UF 55.

16        c)     Facts Specific to Municipal Liability

17        Since March 1, 2012, defendant Eric T. Jones has been the Chief of Police and a

18  policymaking official for the City of Stockton and the Stockton Police Department ("SPD").

19  Defs.' UF 1.  Jones receives all officer-involved shooting ("OIS") investigation reports involving

20  SPD officers.  Defs.' UF 2.  Jones is unaware of any OIS protocol review with which he has

21  disagreed during his entire tenure as Chief of Police.  Defs.' UF 3.  Under Jones's command,

22  SPD's review of OIS investigations commonly remain unresolved for several years; in at least

23  twenty OIS cases, the review was unresolved for up to five years.  Defs.' UF 4.  Under Jones's

24  command, no SPD officer has ever been terminated for use of unreasonable or excessive force.

25  Defs.' UF 5.

26        In August 2016, Officer Wells was a training officer for the City and SPD.  Defs.'

27  UF 8.  Prior to the August 16, 2016 incident, Wells had never discharged his firearm in the line of

28  duty.  Estate's UF 56.  Defendants contend there is no evidence to suggest SPD's use of force

1   policy, training policies or training specific to Officer Wells was constitutionally deficient.

2   Estate's DF 57–59.

3           On September 1, 2017, plaintiffs L.F. and K.F. filed a citizen's complaint with the

4   SPD regarding Wells's involvement in Friday's shooting as provided by California Penal Code

5   section 832.5(a).[3]  Defs.' UF 44.  On July 17, 2018, the San Joaquin County District Attorney's

6   Office issued a memo concluding that "the legal use of force by Wells on August 16, 2016, was

7   justified, and no criminal charges [were] warranted."  Defs.' UF 48.  Following release of the

8   memo, SPD spokesman Joe Silva stated: "This specific report confirmed that Colby Friday was

9   armed with a firearm.  We support the District Attorney's Office findings with this investigation."

10  Defs.' UF 49.  On June 17, 2019, the SPD rejected the complaint filed by L.F. and K.F. in

11  September 2017 as "Unfounded" or "Exonerated."  Defs.' UF 45.

12          B.      Procedural Background

13          On August 8, 2017, Friday's minor children, L.F. and K.F. (collectively, "L.F.

14  plaintiffs"), by and through their guardian ad litem Danisha Brown, filed suit under 42 U.S.C.

15  § 1983, alleging various constitutional violations and violations of California law.  ECF No. 1.

16  On September 1, 2017, L.F. plaintiffs filed an amended complaint, which serves as their operative

17  complaint here.  L.F. Am. Compl., ECF No. 8.  On September 29, 2017, in a separate action,

18  Friday's estate, by and through its personal representative Denise Friday Hall, along with Friday's

19  two other minor children, M.C.F. and K.S.F. (collectively, "Estate plaintiffs"), by and through

20  their guardian ad litem Elizabeth Casas Bautista, also filed suit for various constitutional and state

21  law violations they claim arise from the August 16, 2016 shooting.  *See* Case No. 2:17-cv-02038-

22  KJM-DB; Estate Compl., ECF No. 40.[4]

23          [3] As pertinent here, California Penal Code section 832.5(a) provides: "Each department or
24  agency in this state that employs peace officers shall establish a procedure to investigate
    complaints by members of the public against the personnel of these departments or agencies, and
25  shall make a written description of the procedure available to the public."  Cal. Pen. Code
    § 832.5(a)(1).

26          [4] As part of the case-consolidation process, the complaint filed in 2:17-cv-02038-KJM-DB
27  was merged into the operative docket under case number 2:17-cv-01648-KJM-DB, thus when
    referencing Estate's complaint, the court cites to docket entry ECF No. 40 of the consolidated
28  case number.

1        On March 23, 2018, the court consolidated the two cases into this action.  ECF No.

2  44.  Although many of the parties' claims overlap, the court for clarity here describes the two

3  separate complaints and their respective claims.  The L.F. and K.F. amended complaint brings the

4  following five causes of action: (1) violation of plaintiffs' right to familial association under the

5  Fourteenth Amendment; (2) violation of plaintiffs' right to familial association under the First

6  Amendment; (3) violation of plaintiffs' right to familial association under Article I, section 7 of

7  the California Constitution; (4) violation of the Bane Act, Cal. Civ. Code § 52.1(b); and (5)

8  negligence (wrongful death), Cal. Code. Civ. P. § 377.60(a).  L.F. Am. Compl. ¶¶ 55–87.  The

9  L.F. plaintiffs also allege municipal liability against the City, SPD and Eric Jones based on an

10  "unchecked culture of police misconduct and abuse" caused by these defendants' policies and

11  practices.  *Id.* ¶¶ 44–54.

12        The Estate, M.C.F. and K.S.F. plaintiffs bring the following six causes of action:

13  (1) survival action by Estate for excessive force in violation of the Fourth Amendment;

14  (2) violation of M.C.F and K.S.F.'s Fourteenth Amendment rights to familial association; (3) a

15  claim by all plaintiffs for municipal liability based on unconstitutional custom or policy against

16  the City, SPD and Eric Jones; (4) negligence (wrongful death) action by M.C.F. and K.S.F.;

17  (5) violation of the Bane Act, Cal. Civ. Code § 52.1, by all plaintiffs; and (6) survival action by

18  Estate for denial of medical care in violation of the Fourth Amendment.  Estate Compl. ¶¶ 47–90.

19  All plaintiffs seek various compensatory, general, special and punitive damages, as well as

20  declaratory or injunctive relief, statutory penalties and awards of attorneys' fees and costs.  L.F.

21  Am. Compl. at 18; Estate Compl. at 17.

22        On April 5, 2019, defendants moved for summary judgment, or in the alternative,

23  for partial summary judgment, on all claims.  Mot. Summ. J. ("MSJ"), ECF No. 62-1.  Plaintiffs

24  separately opposed the motion.  L.F. Opp'n, ECF No. 69; Estate Opp'n, ECF No. 71.  Defendants

25  lodged a single, omnibus reply.  Reply, ECF No. 74.  On September 6, 2019, the court heard oral

26  argument on the motion.  *See* Hr'g Min., ECF No. 75.  Counsel Mark Merin, Paul Masuhara, III,

27  and Yolanda Huang appeared for plaintiffs L.F. and K.F.  Counsel K. Chike Odiwe appeared for

28  plaintiffs Estate, M.C.F. and K.S.F.  Counsel Mark Berry appeared for defendants.  At the

1    conclusion of the hearing, the court allowed each party to file supplemental briefing on the issue

2    of qualified immunity, and each set of parties lodged a supplemental brief.  *See* Defs.' Suppl. Br.,

3    ECF No. 78; Pls.' Suppl. Br., ECF No. 79.  Thereafter the court submitted the matter for

4    resolution by written order.

5    III.    LEGAL STANDARD

6            A court will grant summary judgment "if . . . there is no genuine dispute as to any

7    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

8    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

9    resolved only by a finder of fact because they may reasonably be resolved in favor of either

10   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

11           As a general matter, the moving party bears the initial burden of showing the

12   district court "that there is an absence of evidence to support the nonmoving party's case."

13   *Celotex Corp.*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, which "must

14   establish that there is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith*

15   *Radio Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to

16   particular parts of materials in the record . . . ; or show [] that the materials cited do not establish

17   the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

18   evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586

19   ("[The nonmoving party] must do more than simply show that there is some metaphysical doubt

20   as to the material facts").  Moreover, "the requirement is that there be no genuine issue of

21   material fact . . . .  Only disputes over facts that might affect the outcome of the suit under the

22   governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at

23   247–48 (emphasis in original).

24           In deciding a motion for summary judgment, the court draws all inferences and

25   views all evidence in the light most favorable to the nonmoving party.  *Matsushita*, 475 U.S. at

26   587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).  "Where the record taken as a

27   whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

28   issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv.*

1    *Co.*, 391 U.S. 253, 289 (1968)).  Where a genuine dispute exists, the court draws inferences in

2    plaintiffs' favor.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  Parties may object to evidence cited

3    to establish undisputed facts.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir.

4    2010).  A court may consider evidence that would be "admissible at trial."  *Fraser*, 342 F.3d at

5    1036.  But the evidentiary standard for admission at the summary judgment stage is lenient: A

6    court may evaluate evidence in an inadmissible form if the evidentiary objections could be cured

7    at trial.  *See Burch*, 433 F. Supp. 2d at 1119–20.  In other words, admissibility at trial depends not

8    on the evidence's form, but on its content.  *Block*, 253 F.3d at 418–19 (citing *Celotex Corp.*, 477

9    U.S. at 324).  The party seeking admission of evidence "bears the burden of proof of

10   admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the

11   opposing party objects to the proposed evidence, the party seeking admission must direct the

12   district court to "authenticating documents, deposition testimony bearing on attribution, hearsay

13   exceptions and exemptions, or other evidentiary principles under which the evidence in question

14   could be deemed admissible . . . ."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 385–86.  However,

15   courts are sometimes "much more lenient" with the affidavits and documents of the party

16   opposing summary judgment.  *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

17         The Supreme Court has taken care to note that district courts should act "with

18   caution in granting summary judgment," and have authority to "deny summary judgment in a case

19   where there is reason to believe the better course would be to proceed to a full trial."  *Anderson*,

20   477 U.S. at 255.  A trial may be necessary "if the judge has doubt as to the wisdom of terminating

21   the case before trial."  *Gen. Signal Corp. v. MCI Telecomm. Corp.*, 66 F.3d 1500, 1507 (9th Cir.

22   1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be the case

23   "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*,

24   No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at

25   572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

26

27

28

1    IV.    <u>DISCUSSION</u>

2            A.    <u>Federal Claims</u>

3                   1.    <u>Fourth Amendment Claims by Friday's Estate</u>[5]

4                   The Estate brings a single cause of action, for violation of Friday's rights under the

5    Fourth Amendment.  Although the Estate's complaint characterizes the claim as one for excessive

6    force, the parties' summary judgment briefing raises issues as to the reasonableness of the initial

7    investigatory stop conducted by Wells, commonly known as a *Terry* stop.  At the motion hearing,

8    plaintiffs confirmed they assert Wells committed an unconstitutional *Terry* stop, in addition to

9    using excessive force.  The court, therefore, must evaluate each alleged Fourth Amendment

10   violation in turn.

11                              a)    <u>*Terry* Stop Violation</u>

12                  "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

13   Government, and its protections extend to brief investigatory stops of persons or vehicles that fall

14   short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Terry v.

15   Ohio*, 392 U.S. 1, 9 (1968)).  When evaluating the constitutionality of an investigatory stop, the

16   threshold question is whether a stop has occurred at all.  To determine whether a Fourth

17   Amendment investigatory stop has occurred, a court asks: "[I]f, in view of all the circumstances

18   surrounding the incident, a reasonable person would have believed that he was not free to

19   leave[?]"  *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446

20   U.S. 544, 554 (1980)); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it

21   clear that a seizure does not occur simply because a police officer approaches an individual and

22   asks a few questions.").  Under this standard, police officers possess a great deal of freedom in

23   their ability to approach an individual without the encounter arising to the level of a seizure under

24   the Fourth Amendment.  For example, an officer may ask to examine an individual's

25   identification, *Delgado*, 466 U.S. at 216, request consent to search an individual's luggage,

26   _____

27            [5] Although only the Estate makes Fourth Amendment claims, much of the Fourth
     Amendment analysis informs the discussion related to other parties' claims given the detailed
     examination of Wells's conduct under the Constitution.  Therefore, the court considers arguments

28   made on behalf of all plaintiffs in conducting its Fourth Amendment analysis.

1   *Florida v. Royer*, 460 U.S. 491, 501 (1983) (plurality opinion), or even ask general questions

2   based on no suspicion at all, *Delgado*, 466 U.S. at 216, without implicating the Fourth

3   Amendment.

4         Here, defendants focus not on whether an investigatory stop occurred, but whether

5   Wells was justified in conducting the alleged stop.  Reply at 3 ("Officer Wells was wholly

6   justified in initiating a brief investigatory stop to confirm whether Decedent was outstanding

7   domestic violence suspect Kyle Hamilton.").  Justification for an investigatory stop, however, is

8   only relevant to the second step of the *Terry* analysis, not the first.  *See* 3A Charles A. Wright &

9   Arthur R. Miller, *Federal Practice and Procedure*, § 682 (4th ed. 2019) ("Assuming a seizure has

10   occurred, the level of proof the police need to justify it is the next issue.").  Plaintiffs' only

11   argument is a puzzling one: they contend Friday was free to walk away from Wells because it was

12   unreasonable for Wells to conclude Friday was Kyle Hamilton.  L.F. Opp'n at 5 (citing *Royer*,

13   460 U.S. at 497–98; arguing "Friday had the right to refuse to engage with Defendant Wells,");

14   Estate Opp'n at 7 (same).  Plaintiffs also point to the undisputed evidence that Wells said nothing

15   more than, "I need to talk to you," before Friday ignored him and began walking away in a

16   northbound direction.  Estate's UF 23–25.  Defendants respond that plaintiffs' reliance on *Florida

17   v. Royer* is misplaced because a person's ability to refuse an officer's advance is premised on

18   whether the officer had a reasonable suspicion to initiate the stop.  Reply at 2–3 n.2.  Defendants

19   overlook the critical inquiry, which is whether a stop actually occurred; answering that question

20   turns on the suspect's reasonable perception of his ability to freely leave the encounter.  *United

21   States v. Drayton*, 536 U.S. 194, 202 (2002) ("The proper inquiry 'is whether a reasonable person

22   would feel free to decline the officers' requests or otherwise terminate the encounter.'" (quoting

23   *Bostick*, 501 U.S. at 436)).

24         It is well-established that an officer may freely approach a suspect and question

25   him without converting that encounter into a seizure under the Fourth Amendment.  *See Delgado*,

26   466 U.S. at 216.  Here, there is no evidence to suggest a reasonable person would have felt they

27   were prohibited from ignoring Wells's initial advance.  The court finds that based on the

28

1  undisputed evidence, there is no question of disputed fact regarding whether a *Terry* violation

2  occurred in connection with Wells's initial entry into the market.

3        To the extent there is a question regarding a possible *Terry* violation at a later

4  point during the sequence of events in Pena's market, the record discloses no such violation.

5  Plaintiffs present no argument beyond their assertion that Friday was free to ignore Wells's initial

6  advance.  They do not contend Wells continued in his attempt to contact Friday by commanding,

7  "[Y]ou in the white shirt, stop right there[,]" Estate's UF 28, or that after Friday quickened his

8  pace toward the exit, Wells somehow committed an unjustified seizure.  Suh a contention would

9  be  unfounded.  *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Unprovoked flight is simply

10 not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in

11 fact, it is just the opposite.  Allowing officers confronted with such flight to stop the fugitive and

12 investigate further is quite consistent with the individual's right to go about his business or to stay

13 put and remain silent in the face of police questioning.").  Accordingly, on the record before the

14 court, the point at which Friday's conduct is undisputed to have transitioned from apparent simple

15 indifference to hasty avoidance provided legal justification for Wells to attempt a seizure.

16        There is no evidence from which a reasonable juror could conclude Officer Wells

17 committed an initial seizure under the Fourth Amendment, or that any subsequent seizure within

18 the market was unjustified.  Defendants' motion is GRANTED with respect to the *Terry* violation

19 portion of plaintiffs' Fourth Amendment claim.

20              b)      Unreasonable Seizure—Excessive Force

21        The Estate brings a survival claim under § 1983 for excessive force in violation of

22 Friday's Fourth Amendment rights.  M.C.F. Compl. ¶¶ 47–52.  Defendants move for summary

23 judgment because, they say, the undisputed facts show "the use of lethal force was objectively

24 reasonable" and therefore Estate's excessive force claim fails as a matter of law.  MSJ at 4.

25        "'Reasonableness is always the touchstone of Fourth Amendment analysis,' and

26 reasonableness is generally assessed by carefully weighing 'the nature and quality of the intrusion

27 on the individual's Fourth Amendment interests against the importance of the governmental

28

1    interests alleged to justify the intrusion.'"  *County of Los Angeles v. Mendez*, 137 S. Ct. 1539,

2    1546 (2017) (internal citations omitted).

3           The guarantees of the Fourth Amendment include protection from the use of

4    excessive force by "law enforcement officials . . . in the course of an arrest, investigatory stop, or

5    other 'seizure' of a free citizen . . . ."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "All claims

6    of excessive force, whether deadly or not, are analyzed under the objective reasonableness

7    standard of the Fourth Amendment as enunciated in *Graham* and *Garner*."  *Blanford v.*

8    *Sacramento County*, 406 F.3d 1110, 1115 (9th Cir. 2005).  This standard requires the court to

9    "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests

10   against the importance of the governmental interests alleged to justify the intrusion."  *Tennessee*

11   *v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).  In

12   striking this balance here, the court "must consider the risk of bodily harm that [Officer Wells's]

13   actions posed to [Friday] in light of the threat to the public that [Wells] was trying to eliminate."

14   *Scott v. Harris*, 550 U.S. 372, 383 (2007).  The court pays "careful attention to the facts and

15   circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether

16   the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the

17   suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at

18   396.  "Because this inquiry is inherently fact specific, the 'determination whether the force used

19   to effect an arrest was reasonable under the Fourth Amendment should only be taken from the

20   jury in rare cases.'"  *Green v. City and Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir.

21   2014) (reviewing case based on investigatory stop) (quoting *Headwaters Forest Def. v. Cty. of*

22   *Humboldt*, 240 F.3d 1185, 1205–06 (9th Cir. 2000)).

23          "The 'reasonableness' of a particular use of force must be judged from the

24   perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

25   *Graham*, 490 U.S. at 396.  Further, "the calculus of reasonableness must embody allowance for

26   the fact that police officers are often forced to make split-second judgments—in circumstances

27   that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

28   particular situation."  *Id.* at 396–97.  "Therefore, courts 'are free to consider issues outside the

14

1   three enumerated [in *Graham*] when additional facts are necessary to account for the totality of

2   circumstances in a given case.'" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir.

3   2015) (alteration in original) (quoting *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en

4   banc)).

5                               i.        Nature and Quality of Intrusion

6            It is undisputed the intrusion here pertains to Officer Wells's use of lethal force.

7   MSJ at 5 n.1; Estate Opp'n at 6; Estate Compl. ¶ 51.   When an officer fires his service weapon at

8   a person the officer considers a suspect, the nature and quality of the intrusion amounts to lethal

9   force.  *Blanford*, 406 F.3d at 1115 n.9 (citing *Smith v. City of Hemet*, 394 F.3d 689, 704–07 (9th

10  Cir. 2005) (en banc)).   And when lethal force is used, the highest level of Fourth Amendment

11  scrutiny is implicated "because the suspect has a fundamental interest in his own life and because

12  such force frustrates the interest of the individual, and of society, in judicial determination of guilt

13  and punishment."  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (citations

14  and internal quotations omitted), *cert. denied sub nom. City of Newport Beach, Cal. v. Vos*, 139 S.

15  Ct. 2613 (2019).   Where the severity of the intrusion is undisputed, as here, "the issue is

16  determining whether the governmental interests at stake were sufficient to justify it."  *Id.*

17                               ii.       Governmental Interests

18           The court relies on the factors set out in *Graham* when examining the

19  governmental interests at stake.

20                               (a)       Severity of the Crime

21           Defendants contend several factors contributed to the Wells's perception of the

22  severity of Friday's actions.   First, Wells mistook Friday for Kyle Hamilton, a felony domestic

23  violence suspect with an outstanding warrant.  MSJ at 7.  And though domestic violence itself is

24  "not considered particularly severe," defendants argue Wells's belief that Hamilton possessed a

25  gun heightened the severity of the situation.  *Id.*  Additionally, defendants argue "Friday *himself*

26  committed a number of public offenses during the course of the interaction," including unlawfully

27  impeding a police officer in violation of California Penal Code section 148 and possessing a

28

1  concealed firearm in violation of Penal Code section 25400, "one misdemeanor offense and one

2  'wobbler.'" [6]  *Id.* at 7–8 (emphasis in original).

3       Assuming that weight is given to the mistaken identity factor, the Estate argues

4  any perceived threat arising from Hamilton's outstanding domestic violence warrant is

5  unreasonable because "the alleged domestic dispute for which Kyle Hamilton was wanted ended

6  seven (7) days earlier, before the police ever became involved with [Friday] on August 16, 2016."

7  Estate Opp'n at 7.  The Estate also contends defendants' argument that Friday violated Penal

8  Code sections 148 and 25400 is meritless because Friday had a right to refuse Wells's attempt to

9  engage him.  *Id.* (citing *Royer*, 460 U.S. at 497–98 (1983)).  In other words, Friday "had not

10  committed any observable crimes."  *Id.*

11       The Ninth Circuit recently described two scenarios in which this *Graham* factor,

12  severity of the crime, is applicable.  In the first "*Miller*" scenario, named for the case from which

13  it derives, "a particular use of force would be more reasonable, all other things being equal, when

14  applied against a felony suspect than when applied against a person suspected of only a

15  misdemeanor."  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (citing *Miller v.

16  Clark Cty*, 340 F.3d 959 (9th Cir. 2003)).  Thus, "the government's interest in apprehending . . .

17  felons . . . 'strongly' favor[s] the use of force."  *Id.* (citing *Miller*, 340 F.3d at 964).  In the second

18  scenario, although a suspect's threat to safety is itself a distinct factor under *Graham*, the court

19  will nonetheless "use[] the severity of the crime at issue as a proxy for the danger a suspect poses

20  at the time force is applied."  *Id.*  Neither scenario favors summary judgment here.

21       Under the first *Miller* approach, although Wells mistook Friday for Hamilton, and

22  thus believed him to be a felony domestic violence suspect, defendants themselves concede

23

---

24       [6] Defendants provide no definition of the term "wobbler" with reference to section 25400.
In *In re D.D.*, 234 Cal. App. 4th 824, 828–29 (2015), a family law matter, the appellate court

25  provided the following explanation as part of its dissection of section 25400's statutory scheme:
"[A] violation of section 25400 is a felony offense under subdivision (c)(4), a misdemeanor

26  offense under subdivision (c)(7), and an alternate felony/misdemeanor, commonly known as a
'wobbler' offense under subdivision (c)(6)."  *See also People v. Statum*, 28 Cal. 4th 682, 685

27  (2002) (wobbler offenses are deemed felonies unless charged as misdemeanors or reduced to

28  misdemeanors in the court's sentencing discretion).

1   "domestic violence offenses . . . are not considered particularly severe," MSJ at 7 (citing *Smith*,

2   394 F.3d at 702), whether rightly or wrongly.  Domestic violence aside, the offenses defendants

3   say Friday committed during the encounter, misdemeanor impeding of an officer in violation of

4   Penal Code section 148 and a "wobbler" concealing a firearm in violation of Penal Code section

5   25400, also are not the most serious of crimes as defendants concede as well.  *Id.* at 7–8.  At best,

6   even if he had been right about his target's identity, Wells encountered a suspect with an

7   outstanding warrant for an offense that was not "particularly severe," who in the course of

8   responding to Wells's approach committed a misdemeanor and a possible felony.  Such dubious

9   circumstances do not "'strongly' favor[] the use of force" envisioned by *Miller* such that

10   summary judgment should be granted in defendant's favor.  *S.R. Nehad*, 929 F.3d at 1136 (citing

11   *Miller*, 340 F.3d at 964).  Rather, whether these offenses justified the need for lethal force is a

12   question for the finder of fact.

13           Applying the second "proxy-for-danger approach" renders the same conclusion.

14   *Id.*  Under this scenario, conduct committed prior to a suspect's encounter with police has little

15   bearing on evaluating danger if the suspect's conduct at the scene is unrelated to the underlying

16   felony.  *See id.* (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017) (where

17   officer reasonably concluded a burglary might be in progress, severity-of-crime factor weighed in

18   favor of use of force because burglary is "dangerous" and "can end in confrontation leading to

19   violence"), *cert. denied sub nom. Lowry v. City of San Diego, Cal.*, 138 S. Ct. 1283 (2018);

20   *Smith*, 394 F.3d at 702–03 (where suspect had physically assaulted his wife but was standing

21   alone on his porch when officers arrived, "nature of the crime at issue provid[ed] little, if any,

22   basis" for use of force); *Conatser v. City of N. Las Vegas*, No. 2:06-CV-01236-PMP-LRL, 2009

23   WL 10679150, at *6  (D. Nev. Nov. 9, 2009) (finding severity of crime "very low" where no

24   crime was in progress when police arrived, even though suspect might have threatened his mother

25   before police arrived).  Here, viewing Friday's conduct on August 16, 2016 after Wells

26   approached, he ignored Officer Wells's advances, exited the store and walked briskly away and

27   allegedly concealed a firearm in his waistband.  Friday's actions at the scene cannot be said to

28

justify lethal force as a matter of law, particularly given the material disputes regarding Friday's possession of a weapon at the time.

No matter the mode of analysis, material questions of disputed fact regarding the severity of Friday's alleged criminal activity require resolution by a factfinder. This *Graham* factor weighs against summary judgment.

(b) <u>Threat to Safety</u>

"The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *S.R. Nehad*, 929 F.3d at 1132 (citing *Mattos*, 661 F.3d at 441). "The use of deadly force is only reasonable if a suspect 'poses a *significant* threat of death or serious physical injury to the officer or others.'" *Id.* at 1132–33 (emphasis in original) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014)). Here too factual questions regarding the significance of the threat Friday posed preclude entry of summary judgment.

Defendants contend the following facts unequivocally show that Friday posed an imminent threat to Wells's safety: Wells was aware of Hamilton's history of domestic violence and possession of a firearm; Friday resembled Hamilton's physical characteristics; Friday acted suspiciously and ultimately fled when Wells approached him in the market; Friday's left hand was positioned at or near his waistband throughout the pursuit; Wells warned Friday he would shoot, but Friday failed to comply with Wells's orders to stop; Friday was cornered by a locked gate in the parking lot, increasing his motivation to respond with force; Wells heard the sound of metal hitting the pavement when Friday turned toward Wells; Wells was pointing his gun at Friday when Friday turned; and Friday leaned toward the ground to retrieve an item he dropped immediately prior to Wells's discharging his firearm. MSJ at 8–9. Additionally, defendants argue it is relevant that a discarded firearm, bearing Friday's DNA, was found on the other side of the gate during the post-shooting investigation. *Id.* at 9. Arguing that Friday apparently discarded the weapon at some point during the pursuit, defendants contend Wells was unaware of that fact and believed Friday possessed a firearm for the duration of the incident. *Id.*

18

1        The Estate plaintiffs contend that deadly force is not per se reasonable simply

2   because a weapon is perceived to be present, otherwise the presence of a firearm would always

3   justify use of deadly force.  Estate Opp'n at 7 (citing *Glenn v. Washington Cty.*, 673 F.3d 864,

4   871 (9th Cir. 2011); *Blanford*, 406 F.3d at 1115.  The Estate plaintiffs evaluate the threat in light

5   of the two volleys of shots fired by Wells.  *Id.* at 8.  They argue the first volley was unreasonable

6   because Friday was not actually in possession of a weapon, and even where a weapon is

7   suspected, there must have been a "furtive movement, harrowing gesture, or serious verbal threat"

8   to justify use of deadly force.  *Id.* (citing *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

9   Moreover, the second volley was equally unreasonable because, after the first volley, Friday had

10  fallen to the ground, was lying on his side with his empty hand out, no longer posing an apparent

11  threat.  *Id.*  The Estate plaintiffs also note that Friday did indeed stop when impeded by the locked

12  gate in the parking lot; thus a jury could reasonably conclude that Friday heeded Wells's

13  commands to stop when he reached the gate.  *Id.* at 8–9.  Finally, plaintiffs argue that because

14  Wells is the sole surviving witness, assessment of Wells's credibility is a function best left for the

15  jury.  *Id.* at 6 (citing *Deorle v. Rutherford*, 272 F. 3d 1272, 1281 (9th Cir. 2001); Fed. R. Civ. P.

16  56 advisory committee note to 1963 amendment).

17        The disputed facts, when viewed in the Estate plaintiff's favor as required,

18  undermine the reasonableness of Wells's belief that Friday posed a significant threat.  Wells

19  acknowledges that because "there[] [are] many black males with dreadlocks," there was "an equal

20  chance [] that [Friday] [was] not Kyle Hamilton."  Estate's DF 10; Gray Decl., Ex. 20, ECF No.

21  71-23, at 17.  A jury could find that based on this "equal chance" of mistaken identity, it was

22  unreasonable for Wells to presuppose certain characteristics about Friday, mainly that he was

23  known to possess a firearm and subject to a felony warrant.  Estate's DF 31.  Second, the

24  sequence of events in the parking lot behind the market informs the assessment of the

25  reasonableness of the threat.  The Estate plaintiffs contend Wells threatened to shoot Friday in the

26  back after Friday was cornered by the locked gate; thus it was unreasonable for Wells to threaten

27  Friday with deadly force when Friday had nowhere to go and constructively had heeded Wells's

28

1  commands.  Estate's DF 38; Gray Decl., ECF No. Ex. 23 (Faulks Interview), ECF No. 71-26, at

2  14–15.

3          Additionally, there is a dispute as to when Wells issued his final warning in

4  relation to when Friday ceased running.  *See* Estate's DF 41; Gray Decl., Ex. 19 (Wells Depo.),

5  ECF No. 71-22, at 74:8–22; Ex. 24 (Chapman Interview), ECF No. 71-27, at 17.  A jury could

6  reasonably find that during the rapid sequence of events, Friday stopped fleeing yet Wells either

7  continued to threaten the use of deadly force or actually did administer deadly force without

8  further warning; thus Wells's perception of danger compelling such a warning or use of force

9  could be deemed unreasonable.  *Cf. Blanford*, 406 F.3d at 1116 (finding deputies had cause to

10  believe suspect posed a serious danger because he, among other things, failed to heed warnings or

11  commands).

12          Moreover, importantly, the factual record raises questions regarding the

13  reasonableness of Wells's belief that Friday was reaching down to retrieve a gun and Wells's

14  actions based on that belief.  *See, e.g.*, Estate's DF 42 (disputing sequence of events); UF 43

15  (undisputed that Wells never actually saw Friday in possession of weapon); DF 44 (disputed

16  whether Wells heard sound of metal or sound of cellphone hitting the ground immediately before

17  firing his weapon); Defs.' DF 20 (dispute regarding warning Wells gave immediately prior to

18  firing his weapon), 41 (citing Chapman's statement that he did not visually see gun prior to

19  shooting but did witness Friday's hands at his waistband while running).

20          All of the disputed facts relevant to whether Friday posed a threat to anyone's

21  safety cannot be resolved on summary judgment in defendants' favor.  They are for the factfinder

22  to resolve.

23          (c)     <u>Other Factors</u>

24          Because "the *Graham* factors are not exclusive," *Vos*, 892 F.3d at 1033–34, the

25  court may consider other factors within the totality of the circumstances, *Velazquez*, 793 F.3d at

26  1024, including "[w]hat other tactics if any were available to effect the arrest," *Bryan v.*

27  *MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010).  Where "clear, reasonable, and less intrusive

28

1    alternatives," exist, the more uncertain the question of reasonableness becomes.  *Bryan*, 630 F.3d

2    at 831.

3               Here, as the Estate plaintiffs highlight, Wells did not send out a radio dispatch

4    upon his initial observation of Friday or request backup during his pursuit of Friday.  Estate

5    Opp'n at 1; Defs.' UF 12.  Nor did Wells activate his body-worn camera during the pursuit as

6    required by SPD policy.  Estate Opp'n at 1; Defs.' UF 13.  Although some of these precautions

7    may or may not have been required by department policy, they, nonetheless, provide examples of

8    measures available to an officer to mitigate or account for a threat before resorting to deadly

9    force.  *See, e.g.*, *Wallisa v. City of Hesparia*, 369 F. Supp. 3d 990, 1009 (C.D. Cal. 2019) (noting

10   officer "was, or should have been, aware that the arrival of [additional] officers would change the

11   tactical calculus confronting him, likely opening up additional ways to resolve the situation

12   without the need for an intermediate level of force." (quoting *Bryan*, 630 F.3d at 831)).

13              Furthermore, the court may also consider "whether the officer[] gave appropriate

14   warnings before employing the force."  *Wallisa*, 369 F. Supp. 3d at 1008.  As noted above, a

15   material dispute exists as to the scope, and thus appropriateness, of the warnings given by Wells

16   immediately prior to his discharging his service weapon.  *See* Estate's DF 37 (dispute regarding

17   whether Wells stated "I know you have a gun. Stop now or I'll shoot you in the back," Wells

18   Depo. at 72:8–13, or simply stated "I'm going to shoot you in your back," Faulks Interview at 6–

19   7, 17–18, 24).  When an officer deploys deadly force following a disputed warning, the

20   reasonableness of that officer's actions are called into question.  *See A. K. H by & through*

21   *Landeros v. City of Tustin*, 837 F.3d 1005, 1009, 1012–13 (9th Cir. 2016) (use of excessive force

22   violated decedent's Fourth Amendment right when, among other things, officer warned decedent,

23   "Get your hand out of your pocket[,]" and although decedent complied with officer's command,

24   and officer did not see anything in decedent's hand, he shot and killed decedent).

25              Finally, as the Estate plaintiffs contend, Wells is not the "sole surviving witness"

26   to the shooting, Estate Opp'n at 6, given Michael Chapman's presence at the scene, Defs.' UF 26.

27   Wells is the key witness, however, and there is merit to the Estate plaintiffs' contention that

28   Wells's credibility must be considered and determined by the trier of fact.  *See Newmaker v. City*

1    *of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016) ("Summary judgment is not appropriate in

2    § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt.").

3                              iii.    Summary

4            In sum, questions remain as to the severity of the crime, the threat Friday posed to

5    Wells and the community, the possibility of alternative measures to avoid use of deadly force and

6    the adequacy of Wells's warning issued prior to the shooting.  It is the sole province of a jury to

7    resolve these questions, not that of the court.  For these reasons, defendants' motion is DENIED

8    as to the Estate plaintiffs' Fourth Amendment claim for excessive force.

9                      2.     Denial of Medical Care (Fourth Amendment) Claim by Friday's Estate

10           Defendants contend the Estate plaintiffs have conceded this claim given their

11   failure to provide any argument or evidence in opposition to defendants' motion.  Reply at 2.  The

12   Estate's counsel conceded as much when questioned at hearing.  Given the Estate plaintiffs'

13   abandonment of this claim, defendants' motion is GRANTED as to Estate's sixth cause of action

14   for denial of medical care.

15                     3.     Deprivation of Right to Familial Relationship (Fourteenth Amendment)
                             Claim by L.F., K.F., M.C.F. and K.S.F.
16

17           Defendants contend the substantive due process claims of L.F., K.F., M.C.F. and

18   K.S.F. (collectively "minor plaintiffs") for deprivation of their Fourteenth Amendment right to

19   familial association fail because there is no evidence to support a finding that Wells's conduct

20   "shocks the conscience."  Reply at 6–7.  Minor plaintiffs contend the court should apply the lower

21   "deliberate indifference" standard, rather than the heightened "purpose to harm" standard,

22   because when considering the totality of events, rather than only the moments immediately

23   preceding the shooting, Wells had ample time to consider the consequences of his actions.  L.F.

24   Opp'n at 7–8; Estate Opp'n at 10.  Even if the court applies the purpose to harm standard, a jury

25   could find Wells's conduct shocks the conscience because his acts of threatening to shoot Friday

26   in the back and firing a second volley of shots after Friday was incapacitated provides sufficient

27   evidence of an illegitimate purpose to harm.  *See* L.F. Opp'n at 8; Estate Opp'n at 10–11.

28   Plaintiffs are correct, as explained below.

                                            22

1        A parent has a "fundamental liberty interest" in "the companionship and society of

2   his or her child" and "[t]he state's interference with that liberty interest without due process of

3   law is remediable under [§] 1983."  *Kelson v. City of Springfield*, 767 F.2d 651, 655 (9th Cir.

4   1985).  "[T]his constitutional interest in familial companionship and society logically extends to

5   protect children from unwarranted state interference with their relationships with their parents."

6   *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Smith v. City of Fontana*,

7   818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers–Durgin v. de la*

8   *Vina*, 199 F.3d 1037 (9th Cir. 1999)).  Thus, in the Ninth Circuit, "[t]his substantive due process

9   claim may be asserted by both the parents and children of a person killed by law enforcement

10  officers."  *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998).

11       To establish a constitutional substantive due process violation as alleged here,

12  plaintiffs must show an officer's conduct "shocks the conscience."  *Porter*, 546 F.3d at 1137

13  (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  In determining whether

14  excessive force shocks the conscience, the first inquiry is "whether the circumstances are such

15  that actual deliberation [by the officer] is practical."  *Id.* (citing *Moreland*, 159 F.3d at 372)

16  (internal quotation marks omitted)).  "Where actual deliberation is practical, then an officer's

17  'deliberate indifference' may suffice to shock the conscience."  *Wilkinson v. Torres*, 610 F.3d

18  546, 554 (9th Cir. 2010).  "On the other hand, where a law enforcement officer makes a snap

19  judgment because of an escalating situation, his conduct may only be found to shock the

20  conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives."

21  *Id.*  Under the purpose to harm standard, the court looks at the totality of the circumstances to

22  assess whether a jury could reasonably infer an officer was acting for purposes other than

23  legitimate law enforcement.  *Porter*, 546 F.3d at 1141.

24       Here, even under the heightened purpose to harm standard a jury could still

25  reasonably find the totality of the circumstances reveal Wells harbored a purpose to harm distinct

26  from his legitimate law enforcement objectives.  A jury could reasonably infer Wells acted with

27  ill intent based on his admitted uncertainty with respect to his identification of Friday as

28  Hamilton, the abruptness of his threat to shoot Friday in the back as Friday was running away,

1    Wells's belief Friday had a gun even though Wells never saw the gun, and Wells's continued

2    shooting of Friday as he lay motionless on the ground.  A reasonable jury could find Wells's

3    conduct shocks the conscience.

4           Defendants' motion is DENIED with respect to the minor plaintiffs' substantive

5    due process claims against Officer Wells for deprivation of familial association.

6           4.    <u>Deprivation of Right to Familial Relationship (First Amendment) Claim by</u>
                  <u>L.F. and K.F.</u>
7

8           Minor plaintiffs L.F. and K.F. similarly bring a cause of action for deprivation of

9    familial rights under the First Amendment.[7]  L.F. Am. Compl. ¶¶ 61–66.

10          Like the Fourteenth Amendment, "[t]he First Amendment also protects family

11   relationships[] that presuppose deep attachments and commitments to the necessarily few other

12   individuals with whom one shares not only a special community of thoughts, experiences, and

13   beliefs but also distinctively personal aspects of one's life."  *Keates v. Koile*, 883 F.3d 1228, 1236

14   (9th Cir. 2018) (internal quotation marks and citation omitted).  Claims for deprivation of familial

15   rights under the First Amendment receive similar analytical treatment as claims under the

16   Fourteenth Amendment.  *See, e.g.*, *Estate of Osuna v. Cty. of Stanislaus*, No. 1:18-CV-01240-

17   DAD-SAB, 2019 WL 2598694, at *9 (E.D. Cal. June 25, 2019) (denying motion to dismiss First

18   Amendment claim for violation of familial association "[h]aving already found [plaintiffs] . . .

19   sufficiently alleged violation of their familial association rights under the Fourteenth

20   Amendment").

21          Having denied defendants' motion as to minor plaintiffs' Fourteenth Amendment

22   claims for deprivation of familial association, the court also DENIES the motion with respect to

23   L.F. and K.F.'s First Amendment claim, for the same reasons.

24

25

26

---

27          [7] M.C.F. and K.S.F. do not bring a cause of action for deprivation of familial rights under
     the First Amendment; they only allege violation of the Fourteenth Amendment.  *See generally*
28   Estate Compl.

                                          24

1          5.      Qualified Immunity

2          Defendants contend that even if Wells's conduct did offend the constitution, he is

3   entitled to qualified immunity because plaintiffs have not demonstrated that any constitutional

4   rights Wells allegedly violated were clearly established as of the date of Friday's death, August

5   16, 2016.  MSJ at 12–15; Reply 8–9.

6          As this court previously has reviewed, "[q]ualified immunity is a judge-made

7   doctrine designed to 'balance[ ] two important interests—the need to hold public officials

8   accountable when they exercise power irresponsibly and the need to shield officials from

9   harassment, distraction, and liability when they perform their duties reasonably.'"  *Haley v. City*

10  *of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231

11  (2009)).  The doctrine is intended to "give[] government officials breathing room to make

12  reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 563 U.S.

13  731, 743 (2011).

14         The two-pronged test currently used for assessing whether qualified immunity

15  applies was first articulated in *Saucier v. Katz*, 533 U.S. 194 (2001).  *Pearson*, 555 U.S. at 232

16  (citing *Saucier*, 533 U.S. at 201).  Under that test, the court first "decide[d] whether the facts that

17  a plaintiff has alleged or shown make out a violation of a constitutional right."  *Id.* (citing

18  *Saucier*, 533 U.S. at 201 and Fed. R. Civ. P. 12, 50, 56).  Then, "if the plaintiff [] satisfied this

19  first step, the court [] decide[d] whether the right at issue was 'clearly established' at the time of

20  defendant's alleged misconduct."  *Id.* (citing *Saucier*, 533 U.S. at 201).

21         "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of

22  the party seeking summary judgment."  *Tolan*, 572 U.S. at 656 (citations omitted) (per curiam).

23  "This is not a rule specific to qualified immunity; it is simply an application of the more general

24  rule that a 'judge's function' at summary judgment is not 'to weigh the evidence and determine

25  the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting

26  *Anderson*, 477 U.S. at 249); *see also Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("'[T]he

27  ordinary framework for deciding motions for summary judgment' applies to motions for

28  summary judgment based on official immunity.") (citation omitted) (alteration in original).  In

25

1   particular, in determining the established law, the court must take care not to define either the

2   right at issue, or the defendant's conduct for that matter, in a manner that impermissibly resolves

3   factual disputes.  *Tolan*, 572 U.S. at 657 ("[C]ourts must take care not to define a case's 'context'

4   in a manner that imports genuinely disputed factual propositions.") (citing *Brosseau v. Haugen*,

5   543 U.S. 194, 195 (2004)).

6         Since *Pearson*, courts are "permitted to exercise their sound discretion in deciding

7   which of the two prongs of the qualified immunity analysis should be addressed first in light of

8   the circumstances in the particular case at hand."  555 U.S. at 236.  Here, the court has exercised

9   its discretion and analyzed the first merits prong above as to the excessive force and substantive

10   due process claims against Wells, finding plaintiffs have satisfied their burden on the first prong

11   of the qualified immunity analysis.

12         Turning to the second prong, the court notes that clearly established law must be

13   defined with a "high 'degree of specificity.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590

14   (2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)); *City of Escondido,*

15   *Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  This standard is "demanding."  *Wesby*, 138 S. Ct. at

16   589.  The "legal principle [at issue] must have a sufficiently clear foundation in then-existing

17   precedent."  *Id.*  It "must be 'settled law,' . . . , which means it is dictated by 'controlling

18   authority' or 'a robust consensus of cases of persuasive authority,'" rather than merely "suggested

19   by then-existing precedent."  *Id.* at 589−90 (citations, some internal quotation marks omitted).

20         "[A] court must ask whether it would have been clear to a reasonable officer that

21   the alleged conduct 'was unlawful in the situation he confronted.'"  *Ziglar*, 137 S. Ct. at 1867

22   (quoting *Saucier*, 533 U.S. at 202).  While "a case directly on point" is not required "for a right to

23   be clearly established, existing precedent must have placed the statutory or constitutional question

24   beyond debate," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v.*

25   *Pauly*, 137 S. Ct. 548, 551 (2017)), and must "'squarely govern[]' the specific facts at issue," *id.*

26   at 1153 (citing *Mullenix*, 136 S. Ct. at 309).  *See also Pike v. Hester*, 891 F.3d 1131, 1141 (9th

27   Cir. 2018) ("An exact factual match is not required . . . .").  "The rule's contours must be so well

28   defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he

1  confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202).  Thus, "[t]he

2  dispositive question is 'whether the violative nature of particular conduct is clearly established.'"

3  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix*, 136 S. Ct. at 308) (emphasis,

4  alteration in original).

5         Where the existing cases are "too factually dissimilar to clearly establish a

6  constitutional violation" by an officer's actions, the officer is entitled to qualified immunity.

7  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 695 (9th Cir. 2019).  However, "[p]recedent

8  involving similar facts can help move a case beyond the otherwise 'hazy border between

9  excessive and acceptable force' and thereby provide an officer notice that a specific use of force

10  is unlawful."  *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 312).  Although "general

11  statements of the law are not inherently incapable of giving fair and clear warning to officers,"

12  [cite], in some circumstances "a general constitutional rule already identified in the decisional law

13  may apply with obvious clarity to the specific conduct in question, even though 'the very action

14  in question has [not] previously been held unlawful.'"  *Bonivert v. City of Clarkston*, 883 F.3d

15  865, 872 (9th Cir. 2018) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

16         Because resolving whether the asserted federal right was clearly established

17  presents a pure question of law, the court draws on its "full knowledge" of relevant precedent

18  rather than restricting its review to cases identified by plaintiff.  *See Elder v. Holloway*, 510 U.S.

19  510, 514−16 (1994) (citing *Davis*, 468 U.S. at 192 n.9).  Ultimately, "the prior precedent must be

20  'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a

21  'consensus' of courts outside the relevant jurisdiction."  *Sharp v. Cty. Of Orange*, 871 F.3d 901,

22  911 (9th Cir. 2017) (citing *Wilson*, 526 U.S. at 617); *see also Carroll v. Carman*, 574 U.S. 13, 17

23  (2014) (assuming without deciding that controlling circuit precedent could constitute clearly

24  established federal law).

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

a)   Clearly Established Fourth Amendment Law Applicable to Estate's Excessive Force Claim

In this case, the general Fourth Amendment standards discussed above provide a "starting point," but "[t]he dispositive question is 'whether the violative nature of [Wells's] *particular* conduct [was] clearly established" on August 16, 2016. *Isayeva v. Sacramento Sheriff's Department*, 872 F.3d 938, 947 (9th Cir. 2017) (quoting *Mullenix*, 136 S. Ct. at 308) (emphasis in original).  The Supreme Court has cautioned that "[s]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix*, 136 S. Ct. at 308).  Thus, in excessive force claims, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix*, 136 S. Ct. at 309). Nonetheless, as noted generally above, "officials may 'still be on notice that their conduct violates established law even in novel factual circumstances,'" and courts should remain "particularly mindful of this principle in the Fourth Amendment context" to ensure the fact-intensive inquiry required by the Fourth Amendment does not shield officers from liability without "further[ing] the purpose of qualified immunity . . . ." *See Bonivert*, 883 F.3d at 872–73 (quoting *Mattos*, 661 F.3d at 442; *Pearson*, 555 U.S. at 23).

Defendants concede that law enforcement officials may not resort to use of lethal force against an unarmed fleeing felon, but contend "that using deadly force against an armed suspect who reaches to retrieve a weapon is constitutionally sound conduct."  MSJ at 14 (citing *Garner*, 417 U.S. at 11; *Cruz v. City of Anaheim*, 785 F.3d 1076, 1079 (9th Cir. 2014)). Defendants define the precise question here as whether "*every* reasonable officer would have understood that shooting at a fleeing suspect believed to be armed with a firearm, who drops something metal on the ground and bends to retrieve it while an officer has him at gunpoint and after ignoring commands to stop or be shot, offends the Constitution."  MSJ at 14-15 (emphasis in original).  Based on this definition, defendants argue the precedent and principles derived

1  therefrom leave the constitutionality of Wells's behavior "murky, at best." *Id.* Defendants

2  further assert "[t]here appear to be no cases 'squarely governing' the situation Officer Wells was

3  faced with[,]" therefore "it cannot be said that every reasonable Officer in Wells' position was on

4  notice his August 16, 2016 conduct offended constitutional rights." MSJ at 15 (citing *Kisela*, 138

5  S. Ct. at 1153).

6  　　　　　Plaintiffs argue defendants' argument fails because it is based on a disputed

7  version of the facts. L.F. Opp'n at 9. Plaintiffs also underscore the two volleys of shots fired by

8  Wells. As to the first volley, plaintiffs maintain that as of August 16, 2016, the law was clearly

9  established that use of deadly force, even against an armed person or a person reasonably

10  suspected of being armed, was unreasonable under the Fourth Amendment absent a "furtive

11  movement, harrowing gesture, or serious verbal threat [that] might create an immediate threat."

12  L.F. Opp'n at 10 (quoting *George*, 736 F.3d at 838); Estate Opp'n at 12–13. As to the second

13  volley, they argue as of August 16, 2016, "it had been clearly established that use of deadly force

14  against a person on the ground and who no longer posed an immediate threat was unreasonable

15  under the Fourth Amendment." L.F. Opp'n at 10 (citing, e.g., *Drummond v. City of Anaheim*, 343

16  F.3d 1052, 1057–58 (9th Cir. 2003); Estate Opp'n at 12–13.

17  　　　　　In reply, defendants contend Friday made a furtive movement or threatening

18  gesture by reaching to retrieve his dropped cellphone, which Wells believed to be a gun; thus,

19  they say, it is undisputed, as supported by surveillance video, that Friday's conduct precludes a

20  finding that Wells's conduct violated the clearly established law at the time. Reply at 8. This

21  argument, however, merely underscores the parties' diametrically opposed interpretations of the

22  evidence, with one interpretation immunizing Wells's conduct in the face of the established law

23  and the other not. *See, e.g.*, L.F. Opp'n at 6 (arguing Wells's belief Friday was armed and posed

24  significant threat not constitute an "undisputed" fact); Defs.' DF 41 (objecting to plaintiffs'

25  assertion Friday was unarmed based on Chapman's statement he did not visually see the gun prior

26  to the shooting but did view his hands in his waistband). Here as well, where it is disputed

27  whether Friday made a furtive or threatening movement, that dispute is for the jury to resolve.

28  *See, e.g.*, *Nichols v. City of San Jose*, No. 14-CV-03383-BLF, 2017 WL 1398410, at *5 (N.D.

1   Cal. Apr. 19, 2017) ("Viewing the evidence in the light most favorable to Plaintiff, a reasonable

2   jury could find that [plaintiff] was not making furtive movements, but was instead reacting to [the

3   officer's] request to see her ID."); *Mock v. City of Santa Ana*, No. 8:14-CV-00778-CAS (FFMx),

4   2016 WL 492741, at *4 (C.D. Cal. Feb. 8, 2016) (finding factual dispute where officer testified

5   he perceived fleeing suspect make "furtive" movement and move his hand toward his waistband,

6   despite plaintiffs' contention suspect's movement posed no objective threat); *Pelayo v. City of*

7   *Pomona*, No. CV 17-7292 PSG (SKX), 2019 WL 994968, at *2 n.4 (C.D. Cal. Jan. 2, 2019)

8   (noting "[o]n summary judgment, the Court must view the facts in the light most favorable to

9   Plaintiffs, and therefore it cannot take into account Defendants' contention that [plaintiff's]

10   exhibited furtive movements.").

11           "[T]ak[ing] care not to define [this] case's 'context' in a manner that imports

12   genuinely disputed factual propositions" and without "resolv[ing] genuine disputes of fact in

13   favor of the party seeking summary judgment," *Tolan*, 572 U.S. at 656-57 (citations omitted), the

14   court may grant summary judgment "only if Defendants are entitled to qualified immunity on the

15   facts as alleged by the non-moving party," *Blankenhorn*, 485 F.3d at 477 (citing *Barlow v.*

16   *Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).  Given the factual narrative advanced by plaintiffs

17   with sufficient evidentiary support to withstand summary judgment on the merits, the court

18   cannot find as a matter of law that a reasonable officer in Wells's position would not have

19   understood his conduct offended the constitution.  Where resolution of a factual dispute is

20   required, as here, to properly define the factual scenario to reference in determining whether

21   Wells was on notice of Friday's clearly established rights as of August 2016, that resolution is

22   best left to the factfinder in the first instance.

23           As a colleague explained in *Kaur v. City of Lodi*:

24           [A] jury could conclude that the Officer Defendants shot to death a
             man who at most committed a misdemeanor, was not fleeing, had not
25           armed himself with a weapon, was not threatening the Officer
             Defendants or anyone else, and asked them not to shoot him. As the
26           Ninth Circuit has observed, "few things in our case law are as clearly
             established as the principle that an officer may not 'seize an unarmed,
27           nondangerous suspect by shooting him dead' in the absence of
             'probable cause to believe that the [fleeing] suspect poses a threat of
28           serious physical harm, either to the officer or to others.'" *Torres v.*

1

2

*City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011) (quoting *Garner*, 471 U.S. at 11, 105 S. Ct. 1694).

3

263 F. Supp. 3d 947, 970 (E.D. Cal. 2017).  Here, a reasonable jury could find, given the totality

4

of the circumstances, that Friday's actions were non-threatening in nature.  If the jury so finds, the

5

court would proceed to the legal determination that Wells applied deadly force contrary to clearly

6

established law at the time.  *See Garner*, 471 U.S. at 11 ("A police officer may not seize an

7

unarmed, nondangerous suspect by shooting him dead."); *A.K.H. by & through Landeros v. City*

8

*of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("Deadly force is permissible only 'if the suspect

9

threatens the officer with a weapon or there is probable cause to believe that he has committed a

10

crime involving the infliction or threatened infliction of serious physical harm.'") (quoting

11

*Garner*, 471 U.S. at 11); *see also Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018) (finding it

12

was clearly established law applicable to Fourth Amendment excessive force claim that,

13

"'[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm

14

resulting from failing to apprehend him does not justify the use of deadly force to do so[,] . . . A

15

police officer may not seize an unarmed, nondangerous suspect by shooting him dead.'" (citation

16

omitted)).

17

As this court explained in *Brown v. Grinder*, No. 2:13-CV-01007-KJM-KJN, 2019

18

WL 280296, at *21 (E.D. Cal. Jan. 22, 2019), qualified immunity is inappropriate where the court

19

must "construe[] the evidence in a light most favorable to defendants."  For this reason, and the

20

reasons articulated above, defendants are not entitled to qualified immunity with respect to the

21

underlying excessive force claim, at this stage of the proceedings.

22

b)    Right to Familial Association (First and Fourteenth Amendment)

23

As plaintiffs correctly note, defendants focus their qualified immunity argument

24

solely on Wells's Fourth Amendment-related conduct, and do not address the First and

25

Fourteenth Amendment claims.  L.F. Opp'n at 10–11; *see generally* MSJ; *see also* Reply

26

(providing no counter to plaintiffs' assertion defendants have waived their qualified immunity

27

argument with respect to plaintiffs' Fourteenth Amendment claims).  At hearing, defendants'

28

1    counsel drew a linkage between claims, arguing that if qualified immunity is granted on the

2    excessive force claim, it automatically should be granted on the due process claims as well.

3            The court exercises its discretion, given the legal issues at stake, to consider

4    whether qualified immunity is available in the face of plaintiffs' familial association claims under

5    the First and Fourteenth Amendments. *See Easley v. City of Riverside*, 890 F.3d 851, 855 (9th

6    Cir.), *rev'd on other grounds after reh'g en banc*, 765 F. App'x 282 (9th Cir. 2019) (finding

7    district court did not err by raising qualified immunity sua sponte and addressing on summary

8    judgment); *see also* Sec. Am Answers, ECF Nos. 19, 20 (raising qualified immunity affirmative

9    defense).

10           As the appellate court in *Foster v. City of Indio* explained, "it has been clearly

11   established since 1998 'that a police officer violates the Fourteenth Amendment due process

12   clause if he kills a suspect when acting with the purpose to harm, unrelated to a legitimate law

13   enforcement objective.'"  908 F.3d at 1211 (quoting *A.D. v. Cal. Highway Patrol*, 712 F.3d 446,

14   450 (9th Cir. 2013).  For the same reasons discussed above in evaluating the merits of plaintiffs'

15   claims, even if the more stringent purpose to harm standard were applied here, questions of fact

16   remain based on the admitted uncertainty of Wells's identification of Friday as Hamilton, the

17   abruptness of Wells's threat to shoot Friday in the back as Friday was moving away, Friday's

18   alleged possession of a gun and Wells's continued shooting of Friday after he had fallen

19   motionless to the ground.  All of these questions require resolution by the factfinder, meaning

20   defendants are not entitled to qualified immunity on plaintiffs' Fourteenth Amendment due

21   process claims.

22           Given the similar requirements of the familial association claims under the First

23   and Fourteenth Amendments, *Keates v. Koile*, 883 F.3d at 1236, qualified immunity also cannot

24   be granted at this stage with respect to plaintiffs' First Amendment due process claim.

25           6.    <u>Supervisory Liability Claim Against Police Chief Eric Jones by L.F., K.F., M.C.F. and K.S.F.</u>

26

27           Defendants move for summary judgment on the minor plaintiffs' claims that Chief

28   Jones should be held liable for the actions of his subordinate Wells.  Defendants contend "[t]here

32

1  is no evidence that [Chief Jones] *personally* committed any wrongdoing that is causally

2  connected to the Incident[,]" MSJ at 18 (emphasis in original), because his "conduct consisted of

3  *at most* reviewing Officer Wells' conduct and failing to discipline him[,]" Reply at 9 (emphasis in

4  original).  Plaintiffs argue Chief Jones is subject to personal liability because his role as Chief

5  "means that his individual liability 'oftentimes overlaps' with that of his office."  L.F. Opp'n at

6  15; Estate Opp'n at 17.  In other words, plaintiffs assert, "Jones can [] be held liable 'if he

7  knowingly turn[ed] a blind eye to the abuse.'"  L.F. Opp'n at 15 (quoting *OSU Student All. v.*

8  *Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012)); Estate Opp'n at 17.

9              A police chief, as a superior officer, "can be held liable in his individual capacity if

10 he participated in the deprivation of [plaintiff's] constitutional rights."  *Watkins v. City of*

11 *Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998) (citing *Larez v. City of Los Angeles*, 946 F.2d

12 630, 645 (9th Cir. 1991)).  In an excessive force case, a police chief's liability is premised on a

13 jury's finding that the subordinate officer used excessive force.  *Id.*  If a jury finds excessive

14 force, then the police chief's "liability hinges on whether he 'set in motion a series of acts by

15 others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably

16 should have known, would cause others to inflict the constitutional injury.'"  *Id.* (quoting *Larez*,

17 946 F.2d at 646).  "A supervisor can be liable in his individual capacity 'for his own culpable

18 action or inaction in the training, supervision, or control of his subordinates; for his acquiescence

19 in the constitutional deprivation . . . ; or for conduct that showed a reckless or callous indifference

20 to the rights of others."  *Id.* (alteration in original) (quoting *Larez*, 946 F.2d at 646).

21             Plaintiffs assert Chief Jones should be held personally liable for the same reasons

22 *Monell* liability must attach to City and SPD.  L.F. Opp'n at 15; Estate Opp'n at 17.  Plaintiffs'

23 *Monell* claims are discussed in greater detail below.  For purposes of the analysis here, plaintiffs

24 in essence contend Chief Jones, along with the City and SPD, nurtured a culture of allowing

25 excessive force by their officers by failing to expeditiously resolve OIS investigations, failing to

26 exact punishment for numerous excessive force incidents by department officers, failing to

27 implement new or different training for officers and ratifying officers' offending behavior

28 through his post-incident conduct.  L.F. Opp'n at 11–15; Estate Opp'n 14–17.

1         Plaintiffs have presented sufficient evidence to support their position that Chief

2   Jones, in his individual capacity, participated in a ratification process so as to raise a material

3   question whether "he set in motion a series of acts by others, or knowingly refused to terminate a

4   series of acts by others, which he knew or reasonably should have known, would cause others to

5   inflict the constitutional injury." *Watkins*, 145 F.3d at 1093.  The record as reviewed above

6   supports a conclusion that Chief Jones oversaw a department that routinely left OIS investigations

7   regarding excessive force complaints unresolved for years, ignored a clear need for additional

8   training, as evidenced by the alleged constitutional violations stemming from the incident here,

9   and established a pattern of ratifying behavior of his subordinate officers that violated

10  constitutional principles.  Viewing the facts in the light most favorable to plaintiffs, disputed

11  questions of fact preclude entry of summary judgment.

12        Finally, defendants raise the issue of qualified immunity as to Chief Jones for the

13  first time in their reply brief.  Reply at 9.  Under these circumstances, despite counsel's

14  suggestion at hearing that defendants adequately brief the issue, this affirmative defense is

15  deemed waived and the court need not address it here.  *See Liberal v. Estrada*, 632 F.3d 1064,

16  1072 n.6 (9th Cir. 2011) (issues not raised in opening brief but raised for the first time in reply are

17  deemed waived); *see also Summe v. Kenton Cty. Clerk's Office*, 604 F.3d 257, 269 (6th Cir.

18  2010) (declining to address qualified immunity on appeal because defendant failed to address it at

19  summary judgment, and thus waived the defense).  Even if not waived, the applicability of

20  qualified immunity to Chief Jones necessarily depends on resolving the factual questions related

21  to the underlying constitutionality of Officer Wells's actions at the scene, and Chief Jones's

22  connection thereto.  *See* Reply at 1 ("To the extent any constitutional mistakes occurred, . . .

23  Chief Jones [is] entitled to qualified immunity for such.").

24        Defendants' motion is DENIED with respect to minor plaintiffs' claim seeking to

25  impose individual liability on Chief Jones.

26          7.    *Monell* Claims – Municipal Liability

27        Plaintiffs also bring § 1983 claims against the City, SPD and Chief Jones in his

28  official capacity under *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978), for allegedly

unconstitutional policies and practices.  Plaintiffs may support their *Monell* claim through three possible theories by showing: (1) official policies or established customs inflicted the alleged constitutional injury; (2) omissions or failures to act reflected a local government policy of deliberate indifference to the constitutional rights at issue; or (3) a City employee with final policy-making authority ratified a subordinate's unconstitutional act.  *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249−50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).  Here, plaintiffs assert municipal liability under all three theories.  *See* L.F. Opp'n at 11–15; Estate Opp'n at 14–17.

a) <u>Custom or Policy</u>

A custom or policy theory must be "founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified on other grounds by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).  Here again, plaintiffs present evidence that defendants' review of OIS incidents has remained unresolved for several years and despite numerous incidents of alleged excessive force, no SPD officer has ever been terminated for use of unreasonable or excessive force.  L.F. Opp'n at 11–12 (citing Merin Decl., ECF No. 69-3, Ex. 3 (OIS 2010-2014), Ex. 4 (article regarding SPD OIS), Ex. 5 (Pls.' RFP, Set One), Ex. 6 (Defs.' Resp. to RFP, Set One); *see also* Estate Opp'n at 14 (citing Gray Decl., ECF No. 71-3, referencing same evidence).  Plaintiffs also reference "[n]umerous lawsuits [that] have been filed, settled, and remain pending against Defendants which relate to alleged improper uses of force" as part of their effort to show defendants' practice of allowing excessive force behavior to occur.  L.F. Opp'n at 12 (citing Merin Decl., Ex. 7 (listing excessive force lawsuits where settlement reached); Estate Opp'n at 14 (same).

Defendants argue there is no evidence the City or SPD has employed any unconstitutional policies or that any longstanding custom or practice deviates from the constitutional policies they say are in place.  MSJ at 17.  Defendants also maintain that mere allegations from other cases are insufficient to support a municipal liability claim, and evidence of settlements from other excessive force cases is inadmissible for the purpose plaintiffs offer

35

1   them, under Federal Rule of Evidence 408.  Reply at 10 (citing *Collins v. City of N.Y.*, 923

2   F.Supp.2d 462, 479, (E.D.N.Y. 2013); *Green v. Baca*, 226 F.R.D. 624, 640-641 (C.D. Cal.

3   2005)).

4           In this regard, defendants are correct.  Most notably, defendants cite to *Velazquez*

5   *v. City of Long Beach*, in which the court explained:

> [A] custom or practice can be inferred from . . . evidence of repeated
> constitutional violations for which the errant municipal officers were
> not discharged or reprimanded. Evidence of identical incident[s] to
> that alleged by the plaintiff may establish that a municipality was put
> on notice of its agents' unconstitutional actions, while general
> evidence of departmental treatment of complaints and of the use of
> force can support[ ] the [plaintiff's] theory that . . . disciplinary and
> complaint processes . . . contributed to the police excesses
> complained of because the procedures made clear to [the] officer that
> . . . [he] could get away with anything[.]

12   793 F.3d 1010, 1027 (9th Cir. 2015).  Here, plaintiffs provide sufficient evidence to raise a

13   genuine question of disputed fact regarding whether Chief Jones and/or the SPD are employing a

14   custom or policy that permits its officers to act without regard for the consequences.  As noted,

15   the undisputed evidence shows SPD's review of OIS investigations regularly takes several years

16   to resolve, and up to five years in some cases, Estate's UF 4, and no officer has ever been

17   terminated for use of unreasonable force under Chief Jones's command, Estate's UF 5.  *See*

18   *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) ("It is sufficient under our

19   case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel

20   have been permitted to use force with impunity.").  The delays in resolving investigations

21   effectively deprive plaintiffs of the ability to point to factual details to support claims of prior

22   excessive force.  Whether the defendants' practice amounts to a custom or policy permitting

23   unconstitutional behavior is for the jury to decide, given plaintiffs' evidence of "departmental

24   treatment of complaints." *Velasquez*, 793 F.3d at 1027.  Plaintiffs' custom or policy *Monell* claim

25   survives summary judgment.  Given this conclusion, the court need not reach plaintiffs' argument

26   regarding defendants' history of settling cases as suggesting a practice of "avoiding verdicts" and

27   the findings of excessive force or violative conduct on which such verdicts would be based.  L.F.

28   Opp'n at 12; Estate Opp'n at 15.

1     b)  Inadequate Training

2    Plaintiffs also allege municipal liability under a failure to train theory.  To succeed

3 on such a theory, "the failure to train [must] amount[] to deliberate indifference to the rights of

4 persons with whom the police come into contact."  *See City of Canton v. Harris*, 489 U.S. 378,

5 388 (1989).  Defendants contend plaintiffs have identified no specific omission in the City's or

6 SPD's training program that would cause officers to violate citizen's constitutional rights.  Reply

7 at 10 (citing *Smith v. City of Stockton*, No. 2:15-CV-00363-KJM-AC, 2018 WL 3831001, at *12

8 (E.D. Cal. Aug. 13, 2018) (quoting *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir.

9 2014)).

10    Plaintiffs, on the other hand, contend that a failure to train theory may be

11 maintained where "the need for more or different training [wa]s so obvious, and the inadequacy

12 so likely to result in the violation of constitutional rights, that the policy makers . . . can

13 reasonably be said to have been deliberately indifferent to the need."  L.F. Opp'n at 13 (quoting

14 *Rodriguez*, 891 F.3d at 802); Estate Opp'n at 15–16.  Plaintiffs cite to Wells's own position as a

15 field training officer as indicative of the inadequacy of SPD's training program; they argue that

16 because the facts allow the conclusion Wells committed multiple constitutional violations within

17 the short duration of the incident leading to Friday's death, they also support the conclusion

18 SPD's training is deficient.  L.F. Opp'n at 13; Estate Opp'n at 15–16.

19    Plaintiffs fail to identify, as defendants assert, which specific omission from the

20 SPD's training program plaintiffs believe facilitates officers' unconstitutional behavior.  Nor do

21 they identify specific incidents of prior conduct similar to Wells's in August 2016 such that the

22 City and/or the SPD was on notice of the obvious need for new or additional training.[8]  To

23 maintain their claim, plaintiffs must establish that the alleged "'injury would have been avoided'

24 had the governmental entity properly trained its employees."  *Lee*, 250 F.3d at 681 (quoting

25 Oviatt v. Pearce, 954 F.2d 1470, 1473–74 (9th Cir. 1992)).  Yet, plaintiffs' own expert opines that

26 Wells "did not follow the training and standards that every POST (Peace Officers Standard and

27      ―――――――――

28     [8] For the reasons discussed above, reliance on prior settlements by the City and/or SPD regarding use of excessive force are inadmissible to establish *Monell* liability.

1   Training) certified officer should know, and cannot be excused for his failures to comply with the

2   training"; the expert also says that "SPD through its chain of command appears to have endorsed

3   [Wells's] dangerous and *out-of-policy* tactics that are connected to this incident."  Clark Rep.,

4   ECF No. 57-1, at 17–20.  Thus, on this record, plaintiffs "effectively concede[] the training

5   provided by the City and SPD was constitutionally sufficient . . . ."  MSJ at 19.  As this court

6   explained in *Smith v. City of Stockton*, "[f]ailure-to-train claims cannot survive based on training

7   deficiencies alone; the claim must identify a conscience or deliberate choice to ignore training

8   deficiencies."  2018 WL 3831001, at *12 (citing *Lee*, 250 F.3d at 681).  Here, plaintiffs provide

9   insufficient evidence to sustain their *Monell* claim based on a failure to train theory.

c)   Ratification

11   Finally, plaintiffs seek to have municipal liability attach based on a theory of

12   ratification.  A ratification theory may be established in two ways: (1) based on a "pattern" of

13   ratification that constitutes a practice or custom, *Canton*, 489 U.S. at 389, or (2) based on a single

14   act by an official with policy making authority, *Larez*, 946 F.2d at 645–46.

15   Plaintiffs rely on this court's decision in another case against the City of Stockton,

16   *Smith v. City of Stockton*, in which the court found plaintiff's ratification theory sufficient to

17   survive summary judgment under nearly identical circumstances.  2018 WL 3831001, at *13

18   (ratification theory survives summary judgment where plaintiff identified twenty shootings that

19   remained unresolved up to five years, and Chief Jones's approval of investigative findings raised

20   sufficient question as to his role as a policy making official).  In this case, both the disputed and

21   undisputed evidence leads to the same conclusion.  *See* Defs.' UF 1–5, DF 50.  Chief Jones

22   reviews all OIS reports, Estate's UF 2 (citing Merin Decl., Ex. 2, Jones Depo. at 22:24–23:11), is

23   unaware of a single time he has disagreed with the outcome of an OIS report, Estate's UF 3

24   (citing Jones Depo. at 117:21–118:20), at least 20 OIS reports have been unresolved for up to five

25   years, Estate's UF 4 (citing Merin Decl., Ex. 3 (OIS 2010–2014), Ex. 4 (OIS article)), and no

26   officer has ever been terminated as a result of these investigations, Estate's UF 5 (citing Merin

27   Decl., Ex. 5 (Pls.' RFP, Set One at 6), Ex. 6 (Defs.' Resp. to RFP, Set One at 3)).

28

1        Although defendants challenge plaintiffs' reliance on the ratification theory in

2   their moving papers, MSJ at 18–19, their reply brief does not respond to plaintiffs' ratification

3   arguments in opposition to summary judgment.  The court has no basis for reaching a different

4   decision here.  Plaintiffs ratification theory of *Monell* liability survives defendants' summary

5   judgment challenge.

6        B.      State Law Claims

7            1.      Right of Familial Association (Article I, § 7 of the California Constitution)

8        Plaintiffs L.F. and K.F. bring a claim for violation of their right to familial

9   association guaranteed by Article I, Section 7 of the California Constitution.  "California courts

10  have held that the due process provision of the California Constitution, Cal. Const. art I, § 7, is

11  'identical in scope and purpose' to the Due Process Clause of the federal Constitution."  *Nozzi v.*

12  *Hous. Auth. of City of Los Angeles*, 425 F. App'x 539, 542 (9th Cir. 2011) (citing *Gray v.*

13  *Whitmore*, 17 Cal. App. 3d 1, 20 (1971)).  Because the two are "substantially equivalent and []

14  analyzed in a similar fashion[,]" it appears that the survival of one claim as determined above

15  necessitates survival of the other.  *Tain v. State Bd. of Chiropractic Examiners*, 130 Cal. App. 4th

16  609, 629 (2005).

17       There may be questions, however, whether section 7 creates a private right of

18  action for damages caused by a due process violation, given the California Supreme Court's

19  holding in *Katzberg v. Regents of Univ. of Californi*a, 29 Cal. 4th 300 (2002).  Neither party has

20  briefed the applicability of *Katzberg* here, and the court thus declines to consider the question at

21  this time.  *See Estate of Osuna v. Cty. of Stanislaus*, No. 1:18-CV-01240-DAD-SAB, 2019 WL

22  2598694, at *11 (E.D. Cal. June 25, 2019) (declining to delve into *Katzberg* analysis where

23  parties fail to brief issue); *Shen v. Albany Unified Sch. Dist.*, No. 3:17-CV-02478-JD, 2018 WL

24  4053482, at *4 (N.D. Cal. Aug. 24, 2018) ("Defendants have not done [*Katzberg*] justice by

25  making what is effectively a passing reference to it in their briefs, and the Court declines to take it

26  up in that underdeveloped form.").  When questioned at hearing, defendants admitted they had

27  not briefed the issue and effectively conceded on this claim.

28

1   Summary judgment is DENIED on L.F. and K.F.'s claim under Article I, Section 7

2   of the California Constitution.

3           2.    <u>Bane Act (Cal. Civ. Code § 52.1)</u>

4   All minor plaintiffs bring claims under California's Bane Act, codified at

5   California Civil Code section 52.1, which "protects individuals from conduct aimed at interfering

6   with rights that are secured by federal or state law, where the interference is carried out 'by

7   threats, intimidation or coercion.'" *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir.

8   2018) (quoting *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230 (2007)). "Section 52.1

9   provides a cause of action for violations of a plaintiff's state or federal civil rights committed by

10  threats, intimidation, or coercion." *Id.* (citation and internal quotations omitted).

11  Defendants maintain plaintiffs' Bane Act claims fail because plaintiffs cannot

12  demonstrate Wells possessed the specific intent to deprive Friday of his rights.  MSJ at 20.

13  Plaintiffs counter that the Fourteenth Amendment's deliberate indifference or purpose to harm

14  standards, if met, are equally sufficient to establish "specific intent" under the Bane Act.  L.F.

15  Opp'n at 19; Estate Opp'n at 19–20.

16  To establish specific intent, "[e]vidence simply showing that an officer's conduct

17  amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient

18  . . . ." *Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. 2018) (citing *Reese*, 888 F.3d at

19  1045).  Instead, plaintiffs "must show that [Wells] 'intended not only the force, but its

20  unreasonableness, its character as more than necessary under the circumstances.'" *Id.* (quoting

21  *Reese*, 888 F.3d at 1045).  Here, for the same reasons discussed in the Fourteenth Amendment

22  analysis above, plaintiffs have pointed to evidence sufficient to raise a genuine issue for trial

23  regarding whether Wells's possessed the requisite "specific intent[9] to violate [Friday's] right to

24  freedom from unreasonable seizure." *Reese*, 888 F.3d at 1043.

25  Defendants' motion is DENIED as to plaintiffs' Bane Act claims.

---

26       [9] As noted above, specific intent requires that plaintiff "show that [the officer] intended

27  not only the force, but its unreasonableness, its character as more than necessary under the
circumstances." *Smith v. Cty. of Santa Cruz*, No. 17-CV-05095-LHK, 2019 WL 2515841, at *14

28  (N.D. Cal. June 17, 2019) (alteration in original) (citation omitted).

1          3.      Wrongful Death—Negligence (Cal. Code Civ. Proc. § 377.60)

2                  Minor plaintiffs also bring claims for wrongful death under California Code of

3   Civil Procedure sections 377.60(a) and 377.61.  Defendants' only argument in response is that

4   plaintiffs' claims fail for the same reasons as the federal excessive force claim: because Officer

5   Wells's use of lethal force was objectively reasonable.  MSJ at 19–20.  Plaintiffs dispute

6   summary judgment on these claims because their "federal claims do *not* fail," and because state

7   negligence law affords broader protections than does federal Fourth Amendment law, wrongful

8   death claims can survive even where federal claims fail.  L.F. Opp'n at 20 (emphasis in original)

9   (citing *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016)); Estate Opp'n at 18–19.

10  Defendants do not reply.  *See generally* Reply.

11                 To prove negligence, "a plaintiff must show that [the] defendant had a duty to use

12  due care, that he breached that duty, and that the breach was the proximate or legal cause of the

13  resulting injury."  *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (alteration in original)

14  (citations omitted). "[D]uty is a critical element of negligence liability."  *Id.*  The California

15  Supreme Court "ha[s] long recognized that peace officers have a duty to act reasonably when

16  using deadly force."  *Id.* (citations omitted).  To determine reasonableness, state negligence law,

17  like the Fourth Amendment reasonableness test, requires a consideration of the totality of the

18  circumstances surrounding any use of deadly force.  *See id.*

19                 Given defendants' scant argument, and construing the evidence in the light most

20  favorable to plaintiffs, a jury could reasonably conclude it was unreasonable for Wells to deploy

21  deadly force against a fleeing, unarmed suspect, despite Wells's subjective belief Friday posed a

22  significant threat.

23                 Accordingly, summary judgment is DENIED on plaintiffs' wrongful death claims.

24  /////

25  /////

26  /////

27  /////

28  /////

V.   <u>CONCLUSION</u>

Defendants' summary judgment motion is resolved as follows:

- Estate of Colby Friday's first cause of action for excessive force: DENIED;
- L.F. and K.F.'s first cause of action, and M.C.F. and K.S.F's second cause of action for violation of their Fourteenth Amendment right to familial association: DENIED;
- L.F. and K.F.'s second cause of action for violation of their First Amendment right to familial association: DENIED;
- L.F. and K.F.'s third cause of action for violation of their right to familial association under Article I, Section 7 of the California Constitution: DENIED;
- All plaintiffs' *Monell*, municipal liability claims: DENIED as to plaintiffs' ratification and custom and policy theories, and GRANTED as to the inadequate training theory;
- L.F. and K.F.'s fourth cause of action, and M.C.F. and K.S.F's fifth cause of action for violation of the Bane Act, California Civil Code § 52.1: DENIED;
- L.F. and K.F.'s fifth cause of action, and M.C.F. and K.S.F's fourth cause of action for wrongful death (negligence): DENIED;
- Estate of Colby Friday's sixth cause of action for violation of plaintiff's Fourth Amendment right to medical care: GRANTED.

IT IS SO ORDERED.

DATED:  July 17, 2020.

CHIEF UNITED STATES DISTRICT JUDGE